Army Corps of Engineers. I am George House. I am counsel for the appellants here, White Oak Realty, and Citrus. This is a case of first impression. This is a case principally of statutory construction. This is also a case of the arbitrary and capricious development of rules by a district of the Corps of Engineers, not the Corps of Engineers, but by a district of the Corps of Engineers, asserting that it has the right to make those rules under Chevron 2. This is an example of Chevron 2 taken to a higher level. My clients purchased a track of land in 2000. It's a rectangle. It runs to the Mississippi River or the Mississippi Levee Delta on one side, just south of Belle Chase, all the way across to the back levee on the other side, and then over into the area beyond the levee into a swamp. My clients purchased it clearly for the purpose of development. My clients developed several different development plans for the property over the years. Those development plans had to change after Katrina because the market changed after Katrina. But they started development for Katrina. After Katrina, they got another updated development plan which showed putting in a shopping center along Highway 23, and then behind that a housing development containing numerous houses but of a smaller size because that's where the market was going. They filed a formal plat for Plaquemine Parish to develop that new development. They negotiated with Plaquemine Parish about certain things on the plat that was going on. Simultaneously with the end of that period in 2008, the Corps of Engineers had been tasked with rebuilding the levees that had suffered damage during Katrina. It was an enormous project. It was a tremendous amount of money that was Congress appropriated to address that issue. The Corps was beginning to address that issue by borrow pits on the typical plan the Corps had always used of government furnished borrow. That is, the government condemned the property. It then made contracts to deliver it to the levees. The problem the Corps ran into is there were more levees needing repair more quickly than they could condemn and acquire government furnished borrow. So this district, no other district in the country, developed a concept called contractor furnished borrow. And that is individuals who owned accessible clay could sell it to a contractor who could then sell it to the Corps. Now, it so happened, as I told you, the property that the plaintiffs owned is between two levees, Mississippi River levee and the back levee. Both of those had to be repaired. The Corps began sending letters to my client in or about 2008, which says, we're interested in acquiring your property. But it didn't say acquiring. They said taking the property. My clients wrote back initially and said, we're going to have a housing development here. We don't want you to take our property. The Corps said, well, tough. We're still thinking about it. We're examining it. We're sending surveyors out. We're sending people to drill out there to determine the quality and quantity of clay there. My client thought about the thing and said, well, it looks like we're going to be condemned here. We might as well figure out what we've got. So they hired an expert miner, Jerry Howell, to come in and to evaluate the property. Jerry came in and evaluated the property there and said, gosh, you've really got a big deposit here. Simultaneously, the records show the Corps came to the same conclusion in discovery. There's a big clay deposit here. And you're sitting between two levees, which you're immediately requiring. And the miner said, confirmed by the expert for the government, the price of putting clay on top of a levee is mainly the differential between hauling costs. Mining itself and preparing the site are roughly the same. The big cost in levee redevelopment is transportation. The further you drive, it costs a whole lot more. That's the factor that determines everything. You're sitting right here in the middle, 100 yards on either side. In fact, the back levee runs through your property. You've probably got the cheapest available ore that the Corps could ever purchase. So my client writes to the Corps and says, we've reconsidered. We'll try to get in the contractor furnace borrow program. The Corps says, okay, we still are And it's important to remember this in the letter. And it was the same sentence that was in the prior letters. The words are, you are free to do as you wish with the property until it is acquired. Remember those words. Now, the client spends approximately half a million dollars. But you took that as a promise that it would be acquired. Well, I took it, my client took it, that they were still considering condemning the property. But they were telling the client, we haven't acquired it. And until we acquire it, you're free to do with the property as you wish until we acquire it. That becomes the issue when we deal with the mitigation requirement. And I'll come back to that in just a few moments. The Corps, my client goes forward, gets the site qualified. Actually, it's qualified in two tracks. The front track where the housing development was with nothing but open fields, that got qualified first in October 2010 by the Corps as being available for any contractor to come use. And Mr. Howell began mining that track in the early part of 2010. And he mined that track throughout 2010, maybe a little bit in 2011, very successfully. And he sold the clay very successfully to contractors using it for the Corps. In the meantime, the bigger track behind the property, behind the first track, was the track two, which was not open fields. It was partially open fields, about 40 acres, partially wetlands, about 100 acres, and partially habitat type called bottomland hardwood dry, i.e. that these are uplands not within its Clean Water Act jurisdiction. The Corps says, we have no jurisdiction over that property or your use of that property. And they consistently say that. When we got the second track qualified later in 2010, the Corps then said, you're going to need to mitigate for the bottomland hardwoods, the uplands. My client and a number of other people, other parties who are similarly situated with bottomland hardwood uplands, which seems an oxymoron, but that's what it's called, said, wait a minute. Why have we got to mitigate for anything? We can do whatever we want to with it. The Corps says, you can do whatever you want to with it, but because of the Water Resource Development Act of 86, as amended in 2007 after Katrina, we're required to mitigate if we impact bottomland hardwoods, uplands. And? Well, to be clear, you're not required to do anything. It's just that you want to sell this to the Corps. If we want to sell it to the Corps, we have to. It's not a regulatory action. It's a spending action. Your Honor, I think what it does is their action limits our ability to participate in the marketplace, us and anyone else who has these properties. The limitation on our ability to ... Well, it limits your ability to deal with the Corps. But the Corps, Your Honor, had federalized all the levies. There was no other use of the clay. Everything was either paid for by the Corps. The Corps says if we're contributing money to it, you have to do what the Corps says. So the Corps, there was no place else to sell the clay for no other purpose besides the federal levies. So there was no market for it. And you couldn't do anything else with the property? The Corps was preventing you from doing anything else with the property? No, but the original development plan could not work. As the Corps' expert testified ... Your original development plan could not work. But did the Corps prevent you from doing anything else with the property? No, but their expert testified that the only thing the property was good for was for hunting and recreation. It had no other opportunity uses. Because you couldn't get to it because you had to go through the mine which was already built. That's the Corps' expert. So the only thing we could do with it was have hunting license on it, which is not a particularly valuable entity. We could mine it, the Corps said, if we paid the mitigation cost. Now, the problem with that is there is no statutory procedure that allows the Corps to make that impediment to our ability to sell that clay. If you read carefully, and not very carefully, WERDA, which is where you need to go in order to make this decision, the statute is pretty clear. It's a planning statute. And what it does, it says to the Corps, you have to propose how you're going to mine and how you're going to mitigate to us, Congress, before you do it. And the other important parts of that, if you look at 2283 ... What does it say, what you just said? Well, you have to read the whole statute. If you read the whole statute, if you read, as our brief shows, the committee reports on it, it tells you why the Corps enacted this statute in 1986. And it tells you that it's a planning, a budgeting statute. It has nothing in the statute at all about making rules or regulations. It doesn't give the Corps, under this statute, the ability to make any rules. Does it preclude the Corps from doing this, or the Secretary of Interior, or whoever it is? It doesn't preclude it. There are no words that say, that shall not make any rules. But there are no words that says, you can make any rules or regulations. It's silent. And silence, generally in the law, has been determined to say you don't have that right. The Fifth Circuit has said that, that you don't have the right to make rules and regulations just because it's silent. If the statute provides for, doesn't provide for rulemaking, it's generally considered not to be able to rulemake. Well, this is why I asked about the regulatory versus spending question. I mean, if this were the Army Corps or the Secretary of the Interior regulating you, that's sort of one setting. But it sounds like here, they're trying to buy from you, or they're hoping to buy from you, but they want to buy under certain conditions. They want to buy if we pay for the mitigation. Right. It's a condition of the contract. That's correct. And that's the condition in which we say they cannot put upon us because it's not within their regulatory authority to make that rule. If you read 2283. Let's stipulate that the Pentagon doesn't have statutory authority to buy pencils. Does that mean they can't buy pencils? You see where I'm going? I mean, it seems to me that part of their general appropriations authority, general authorization statutes, allows them to spend money for things consistent with their mission. I assume the government's going to stand up and argue that this was fully within their broader authority. I'm sure they will argue that. The difference here is that this statute provides who pays for it. If you read 2283C, it tells you exactly who pays for the mitigation, and who pays for it are the Corps and the non-federal sponsors. It sets forth who pays for the mitigation, and the transference of that mitigation obligation to third parties who are not controlled by the Corps is improper. I'll display my ignorance. If you know in advance that you've got this obligation for buying these mitigation things, why didn't that affect the sales price? The problem, Your Honor, is you had to go to the purchase requirement, and it tells you that. The second issue, they mandated that we had to buy only wetland mitigation credits. Wetland mitigation credits cost us $25,000 a credit. It was up to $30,000. It was going to cost us $2.5 million up front to be able to mine this track, and it doesn't provide that. The statute here doesn't provide for that. It provides for in-kind mitigation. And everyone agrees in-kind is not bottom-down hardwood dry and wet. There were wet mitigation banks, but we had to pay the extreme price of $2.5 million to play in the game. So there are two pieces, the mitigation requirement and then the purchase requirement. The purchase requirement made it impossible for us to play in the game. It also made it impossible for every other person to play in the game if you had this situation. It was so expensive. We proved that we could mitigate in-kind. We proved and brought them a mitigation plan and was fully mature, 100 acres of bottomland hardwood dry and wet, 45 acres of pristine swamp, which we said we will give you the federal government in mitigation as for this project. There are no rules for upland mitigation. There are no procedures for it. We said we'll give this to you. Initially, the Corps liked that. They said this is a good idea to us. In the end, they flipped on us in 2013 and said, well, we've decided that we're not going to go forward with that and you cannot put in-kind mitigation in place. This is a lot of case. I'm sorry, I'm going to take the last five minutes for both. There's a whole lot here. Good morning, Your Honors. May it please the Court. My name is Tecla Hanson-Young, and I represent the Army Corps of Engineers. With me at Council's table is Paige O'Hale from the U.S. Attorney's Office. There are three important things for this Court to keep in mind when evaluating this case. First, and this was touched on in the opening remarks, White Oak still owns its property. It can still develop it as it wishes. It can go back to its original plan and develop its shopping center and housing development, and it can still actually excavate and sell its soil or clay on its property for use in non-federal levy construction projects. And there are, in fact, state and local levy construction projects that may or may not have the same mitigation requirement associated with them but are not operated or constructed through contracts with the Army Corps of Engineers. But those others don't have the location that this has adjoining to levies. That may or may not be so, but this gets to my next point, which is that there is no property interest here in selling minerals to the Army Corps for use in federal levy construction. There is a property interest in excavating minerals on one's land that one owns, but here the only asserted property interest that White Oak alleges was taken was the loss of a business opportunity and specifically the loss of its ability to sell soil to the Army Corps of Engineers. And this gets back to Judge Ho's question about whether this is a sort of general regulation on White Oak's ability to use its property or really whether this is more of a spending requirement. And what's notable about this case is that the Corps imposed this mitigation requirement through its contracts with its levy construction contractors. And its levy construction contractors were required to provide proof that mitigation had been purchased prior to commencing excavation and construction of levies. The requirement was never imposed on landowners individually, and in fact the record is replete with documentation from the Corps stating that it has nothing to do with the contracts entered into between its levy contractors and landowners. The mitigation requirement was exclusively a contractual requirement. It is also based on the Corps' statutory authority. Now the opposing counsel states that there is simply no basis in the Water Resources Development Act for requiring mitigation to bottomland hardwood forests, but that is just not true. If you look at Section 2283D1, it states that projects must have a specific plan to mitigate fish and wildlife losses created by water resources development projects. And those plans, mitigation projects and plans, shall ensure that impacts to bottomland hardwood forests are mitigated in kind. So the Corps interpreted that language to provide it with the authority to require mitigation of impacts to bottomland hardwood forests when soil is used in federal projects. So there is a nexus to a federal project. There is also other statutory authority that the Corps could have relied on, and in fact did rely on in its explanation of the mitigation requirement, and that comes from the NEPA regulations, which require the Corps to consider alternatives that will avoid and minimize impacts to habitat. Those regulations are 40 CFR 1502.14, 1508.20, and there is a discussion of this authority in the record at USACE 3145-46, which is reproduced in the excerpts. I would like to touch on a point raised by my opposing counsel about Chevron deference. We submit that Chevron deference is appropriate here because the Corps has delegated statutory authority to implement the Water Resources Development Act, reconstruct these levees under several emergency authorization bills that were enacted after Hurricanes Katrina and Rita destroyed the levees here. But even if this Court finds that Chevron deference is inappropriate because the interpretation was too informal, this Court should still defer under Skidmore because the Corps reasonably explained its decision. It thoroughly considered the issue. Its decision is based on a reasonable interpretation of the statute, and the Corps applied it consistently. I would also like to point this Court to pages in the record where the Corps specifically talks about how it sort of got to its decision for these particular projects, and those pages are in my brief. But again, it's USACE 573-82, and those pages reference the prior environmental analyses and statutes under which these levees were originally constructed. And the Corps was directed by Congress in the late 2000s to go and rebuild those levees under those original Water Resources Development Act authorizations. And so it was sort of a, you know, my opposing counsel sort of says, well, this district did something that no other district did. But first of all, the record shows that the Corps has otherwise relied on contract or furnished borrow. And secondly, it doesn't really matter because the Corps was authorized to do so by Congress here. Help me understand these wetland credits, mitigation credits. Yes. So the Army Corps, in developing its mitigation plan for the levee reconstruction here, the Army Corps required its contractors to provide mitigation in the form of proof of purchase of mitigation bank credits. And what happens with that money? Well, the money, so the contractors would pay, if the contractors proposed to excavate soil that would impact bottomland hardwood forest or destroy the forest essentially, then the contractors would submit a proposal to the Corps saying we want to excavate 80 acres. The Corps would look at the habitat value of those 80 acres, which is what happened here. There was 80 proposed acres to be excavated. The Corps looked at those 80 acres in conjunction with the Fish and Wildlife Service to determine the habitat value of those 80 acres and then determined that the contractor would have to purchase 40 units of habitat credits from a mitigation bank. And what happens to that money? That money goes to the mitigation bank to purchase the credits, which then have the effect of preserving equivalent bottomland hardwood forest habitat to offset the destroyed bottomland hardwood forest that is impacted. So that money is applied to purchasing or improving or what? Purchasing mitigation bank credits, specifically to... I mean, once the bank gets the money, it belongs presumably to the Corps. No, the land, I believe what happens is that the mitigation banks own valuable habitat and sort of use the money to acquire and maintain and preserve the valuable habitats. The Corps never owns the habitat that is purchased. The habitat is just simply being maintained for its habitat value. By the owners or by the Corps? By the mitigation bank. The mitigation bank does the improvement? It's not necessarily improvement, but it holds and maintains the preserved habitat to offset the habitat losses. So I'm not sure if you're going there with your questions, but what I'm sensing is a question about who is there a taking of money maybe or was the money being transferred, was the money that the contractor or maybe White Oak would have to pay going to be transferred to a third party or to the Army Corps? Was the Corps extracting a benefit from White Oak? Well, the answer is no, because the, I mean, for the simple first reason, which is that the Corps didn't impose a requirement on White Oak. It imposed it on its contractors. Whether a contractor chose to excavate White Oak's property or not has nothing to do with, you know, with White Oak's property interest. But it affects what White Oak gets for its clay, doesn't it? It may affect the market price of the clay, but again, White Oak isn't entitled to a certain market price or the best market price for its clay. If it's an even playing field. Well, it is an even playing field, because other property owners who also owned property with bottomland hardwood forest were subject to the same, I don't even want to say a requirement, because the requirement wasn't imposed on the landowner. The requirement was imposed on the contractor. Right, it could pass through. Alternately, White Oak could have negotiated with a contractor to pay for the mitigation credit and then receive less money. But essentially, I mean, you have to look at it, or one way of looking at it is White Oak owned a certain piece of property, and that property had certain features on it that made it less valuable for use as barrow excavation because of this mitigation requirement, which the Corps put the public on notice when it was developing and provided an opportunity to comment. So from the outset, the public was on notice of this requirement. But White Oak, the bottom line is White Oak owned a certain type of property. It had certain features associated with it. And what White Oak is trying to do is say, well, Army Corps, my property will, because of the features associated with my property, I'm going to make less money on this transaction than somebody else who didn't have that kind of a property. It's not the government's business to ensure that everybody gets the same value for property with different features. It's a free market, and you have what you have, and you can sell it on the terms that the government will buy it on. The Corps essentially created a business opportunity for White Oak to participate in, but it had certain parameters on it. And, you know, finding in favor of White Oak would be akin to sort of saying, in Judge Ho's example, if the Department of Defense wanted to buy pencils but White Oak was only selling pens, to say, you must buy my pens, even though they aren't erasable. It's more like two different vendors of pencils, and one has a tax and the other doesn't. That is – it's not a tax on the vendor of the pencil because it's – Well, it's any kind of imposed cost that raises the amount you have to get to break even or make a profit. I give you that, Your Honor, but the analogy does not hold because, in your example, the two pencils are identical. Here, the two properties that might be owned by any different landowner are different. So you would have, in that case, two manufacturers competing on equal footing with the same product, being treated differently, and then you might have a due process or equal protection problem. Here you have landowners trying to sell their soil to contractors who may make their decision to buy it based on any number of circumstances that are unique to the particular landowner. For example, how – you know, the other contractual terms is the – you know, how long do – Or location. Location. Do they have the type of the soil on the property? Is it the right mix of clay, or is it too sandy? So there's any number of requirements – I mean, the core imposed soil type requirements on property owners. The better analogy would be someone who owned sand trying to come in and say, Army Corps, buy my sand, even though it doesn't fit your technical requirements, because you just need fill material, and otherwise you're not giving me the same business opportunity that somebody else has. The bottom line is that White Oak has no property interest in selling its soil to the Army Corps of Engineers, free of any sort of contractual terms that the Corps would want to impose on it. Also, White Oak still can develop its land. It still retains title to its land. The Army Corps didn't actually take any of its physical property. I would also like to point out, just sort of backing up, that there's a question here, and we argue that this court actually doesn't even have the jurisdiction to consider the takings claim in the first place, because White Oak is not asking for compensation. It's instead asking for declaratory relief. And the Supreme Court, in a plurality, said equitable relief is sometimes available for takings claims if Congress withdrew a Tucker Act remedy or remedy for just compensation. And the court, the plurality in the Eastern Enterprises case, found that Congress could not have intended a Tucker Act remedy in that case because the statute required the payment of money, retroactive liability on a coal company, to pay money into a fund. And so it would be nonsensical to require the coal company to go to the Court of Federal Claims and ask for the precise amount of money to be returned to it. That would be the normal remedy. If the government takes your property, you have to go to the Court of Federal Claims to get compensation for the property that was taken. Here, White Oak's property was never taken by the government, and so again it's asking for equitable relief. But this case is not similar to the facts of the Eastern Enterprises decision because here there was no retroactive requirement on White Oak to pay money for something that it didn't do or was no longer doing. In the Eastern Enterprises case, the coal company was required to pay money to a retiree benefit fund, and it was for employees that were not its own, and it was for a time period when it wasn't actually operating. So it was sort of a punitive, if you will, requirement, statutory requirement. Do you acknowledge that if the government undertakes repeated threats to condemn, that that can have a negative effect on the value of the property? I hesitate to state a formal position on that issue, but I can. This is about our common sense. I mean, if the threat of condemnation is there, wouldn't that naturally have some negative effect? We can dispute how much. The mere threat of condemnation would likely not constitute a taking in the government's opinion. I'm just asking if it has a negative effect on value. We can debate the doctrine separately. Potentially, but here the government didn't repeatedly threaten to take White Oak's property. What happened was in 2008, the Army Corps tried to go to the site. In fact, White Oak's principals tried to keep the Corps off the site, refused to let the Corps on the site at times. The Army Corps tried to go to the site to figure out whether it could condemn the property for use as a borrow site, and White Oak objected. And then the citation is USACE 190 and was discussed by— Does condemnation mean that the owner would get nothing in exchange for the taking? No. Condemnation means the Corps would actually acquire title to the property and would have to pay money for the acquisition of the land. So whether or not it negatively affected the value of the property could depend on the value of the property. In other words, the taking could result in somebody, depending on the property, getting more value than they might otherwise get for it. Potentially, right. It depends on how the property was valued and what the finder of facts would come down with with respect to value. But here— But your point is that there were no threats. There were no threats. I heard talk about threats, so I want to understand. Yeah, there were no threats at all. And if you look at that letter, it's at 190 in the record, which is not included in the— The Army Corps wrote to White Oak and said, We're considering taking title to your property, and if we did, we would pay you. But until we actually take your property, you have every right to do with it what you wish to do. And in fact, if White Oak had actually developed it at a shopping center at that point, it probably would have increased the value if the Army Corps had actually decided to take the property, because then it would be a shopping center rather than an empty, undeveloped parcel of land. But that's neither here nor there. The point is that the Army Corps put White Oak on notice that it was not taking its property and that it was considering it, and it could do what it wanted to do until then. And all of those inquiries into whether the Corps would condemn the property ceased in 2008. So the Corps investigated and then abandoned its efforts in 2008. It didn't actually try to condemn the property at that point going forward, and then the property sort of moved into the contractor-furnished borrow category. You're saying after 2008 there were no arrests or statements? That's correct. The Corps didn't try to condemn the property or didn't further investigate condemning the property. And that is because it was too time-consuming. And I see I'm over? You've got a minute and eight. Oh, I left. Yeah. Okay, great. Thanks. Sorry. No, that's fine. I just didn't want to run over. And part of the reason why the Corps decided not to try to condemn the property is because the Corps had to obtain too much soil to accomplish its objectives, and it couldn't actually acquire that much soil and follow all of its statutory obligations and reconstruct all of the levees. It was just too much. There was too much material required. And that also, that same reason, goes to explain why the Army Corps rejected White Oak's proposed on-site mitigation plan. It was simply impracticable for the Corps to try to develop on-site management, and particularly with landowners. When the Corps was actually contracting with its contractors, it had no relationship with landowners directly in these levee construction projects. Instead of mitigation, could you have just offered us a lower price? The, or rather the Corps, White Oak could have sold its soil at a lower price, yes, or the Corps could have potentially paid more. I mean, because these were bids that were being put out by the Corps. Contractors were bidding on these projects. And so ultimately, the market should reflect the correct cost or all of the costs of obtaining the soil. Ultimately, the Corps would be paying for the mitigation in any event because the costs of obtaining the soil would be built in. Everybody knew what the mitigation requirements were if excavating soil was going to impact bottomland hardwood forests. Thank you, Counsel. Thank you, Your Honor. Rebuttal. Let me cover a few quick points with you. The case of National Beverage in the Court of Claims is an example here of what the Corps did when it condemned property. The Corps' position in National Beverage, as you brought this up, was that they paid for the surface value. They will not pay for the ore in the ground. National Beverage sued the Corps saying, I'm entitled to be paid for the ore in the ground. And National Beverage won. But the Corps' modus operandi in this district in 2008 was, we only pay for the surface value, which in National Beverage, was some farming and some cattle pastures, instead of paying for the value of the ore. That's why everybody was so afraid of condemnation. It was a real threat. They'd take it for your surface value and pay you nothing for your ore. That was the situation. That's a condemnation case. That's the condemnation case in the Court of Claims. They took the property. So you're saying that's not on the table. No. Well, in 2008, the reason they stopped was because he wrote a letter saying, we'll go for contract to furnish, borrow. They didn't stop until after that. They sent a letter, the second letter, there are two letters. You're now breathing. There are two letters. One came afterwards, and they said to us, after we said we'll do contract to furnish, borrow for you, they wrote another letter saying, we're not saying we won't condemn you, but go forward with your proposal, see if you can be contract to furnish. So that's why they stopped. They didn't stop because of any other reason. The reasons she gave you today are not in the record any place. That's the first time I've heard those reasons about why they stopped. I've never seen any reasons why they stopped other than we said we'll do it. The other thing I want to point out on the market value here, when the IRA came out that said that we would have to put up some money to cover mitigation, they listed about ten different properties, including ours, that had this problem. Do you know how many of those properties ever bought any bottom and hardwood credits in order to sell clay to the government? Of those ten, they identified as qualified clay, not a one, because the market was shut down for everyone who had the situation that caused the mitigation at the price of $2.5 million for what we had. Other people had the same. Others had a bit more property. Do you know how many wetland credits were actually bought by private parties for any reason going until January of last year? 12.4 acres. And they ranged for different things. This proposal shut out from the marketplace all those listed in that IRE, which had hundreds of acres of clay, could not participate because the cost was so high. And this is a condition they imposed on some parcels but not others. Is that right? Only those parcels that had dry, bottomland hardwood that was overlaying the clay. First you had to prove the clay was there. Then you had to prove what was on top of it. So what if the government had simply said, you know what, we're just not going to make an offer at all on those types of properties. We're only going to buy over here. Then you're right in the situation that was the Encino case or the case where the T.W.C. case, Tidewater Cable case, in which they were not allowed to play in the field with everyone else. They're basically telling you if you've got bottomland hardwoods, you can't play in the field. Your property. That's my question. Does the government have that right to just decide I want to buy this, not that, for any number of reasons? It doesn't if it's arbitrary and capricious. It doesn't if the reason behind it is to exclude from the marketplace a certain limited part of people. Remember the Tidewater Cable place, they didn't want the old contractors bidding for the statewide work. That's the T.W.C. case. And the Fifth Circuit said in that case, that's wrong. You cannot limit the playing field that way by putting a condition on what you have to do to play. A condition that's arbitrary. Yes. A condition that's just random and arbitrary. That's correct. Or based on some naked political preference. I get that. This is, I take it, an environmental decision to either not buy a certain type of property or to buy only with certain conditions. Is that okay? There is an environmental condition which they were requiring to be mitigated for. But I do want to go to the point to tell you, again, if you read the statute, what they are entitled to do, it says that they shall mitigate for bottomland hardwoods in kind. We know what in kind means. To the extent possible. At the end it says to the extent possible. But we proved you could do it. They didn't reject our plan. If you read the rejection, which is in our brief as well, they rejected it because they said it was costly, they said it was time consuming, and there was a question. They were under some pressure to address the levee situation fairly expeditiously. So they could make a determination that this was an inefficient way to do it, which means it's effectively not possible to do it given the time constraints. Isn't that what the decision was about? What the decision said, and I'm over my time, but I wish to answer your question. The decision said that the trees are not mature and they have to grow, and we have to monitor it. We offer them mature trees, fully grown, controlled by the Southeast Land Trust Conservancy, just like a wetland bank. Nothing had to be done but approve it. And that process went on for four months, and there were different views within the agency about whether to accept this or not. But the excuse in the end was, the only excuse they gave, was the property was not mature and ready to be, and we'd have to monitor it and take time. There was no time required here. We proved you could give it in time. In fact, the Corps originally said that they were going to themselves create a bank. They are today creating an in-kind bank. Thank you, Counsel. Good sales. This concludes our.